UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
The Estate of LANA KEENAN,
PADRAIG KEENAN, SARA KEENEN,
PIERCE KEENAN, a minor child, and
DAMIEN KEENAN, a minor child,

        Plaintiffs,
        -v-

DR. JAMIE HOFFMAN-ROSENFELD, *et al.*,

        Defendants.
-------------------------------------------------------X
FEUERSTEIN, S., Senior District Judge:

FILED
CLERK

7/29/2019 5:14 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

Case No. 16-cv-0149 (SFJ)(AYS)
**Memorandum and Order**
(re: Northwell Defendants[1])

I.    <u>Introduction</u>

    Plaintiffs the Estate of Lana Keenan ("Lana"), Padraig Keenan ( "Father"), Sara Keenan

("Sara"; together with Father, the "Parents"), Pierce Keenan ("Pierce"), and Damien Keenan

("Damien"; together with Pierce, the "Brothers"; collectively, with Lana and the Parents, the

"Plaintiffs") commenced this action against Defendants Dr. Jamie Hoffman-Rosenfeld, s/h/a

Jamie Hoffman-Rosenfeld, as an Individual acting under color of State Law ("Hoffman-

Rosenfeld"), Dr. Ayse Avcioglu ("Avcioglu"),[2] Dr. Mark Adam Mittler, s/h/a Dr. Adam Mittler,

Individually and as a Person Operating Under Color of State Law ("Mittler"), Cristin Gilleran

("Gilleran") (hereafter, together with Hoffman-Rosenfeld and Mittler, the "Northwell Trio"),

---

[1] Together with this Memorandum and Order, the Court is issuing its Memorandum and Order granting the County Defendants' Summary Judgment Motion (hereafter, the "County Summary Judgment Order"). (*See* ECF No. 180.) The Court assumes the parties' familiarity with the County Summary Judgment Order and incorporates by reference herein the terms of art defined therein.

[2] Other than in a footnote, Defendant Avcioglu is not mentioned in Plaintiffs' Opposition. (*See* Opp'n at 9, note 3.) Accordingly, any § 1983 claims against her are deemed waived. (*See* County Summary Judgment Order, Part III(B)(4) (discussing waiver of claim when plaintiff fails to argue in support of such claim, and collecting cases).)

Southside Hospital ("Southside"), Northwell Health System, s/h/a Northwell Health ("Northwell"), Long Island Jewish Medical Center, s/h/a Cohen Children's Medical Center ("CCHC") (hereafter, together with Southside and Northwell, the "Northwell Hospital Entities")(collectively, the "Northwell Defendants"), among other defendants, alleging, *inter alia*, various civil rights claims pursuant to 42 U.S.C. § 1983. (*See generally* Complaint (ECF No. 1); Amended Complaint (ECF No. 108).) Presently before the Court is the Northwell Defendants' motion seeking summary judgment in their favor on all of Plaintiff's claims (hereafter, the "Summary Judgment Motion") (*see* ECF No. 148; *see also* Mem. of Law in Supp. of Mot. Summ. J. (ECF No. 148-20) (hereafter, "Support Memo")), which Plaintiffs oppose (hereafter, "Opposition" or "Opp'n") (*see* ECF No. 150[3]). For the reasons that follow, Defendants' Summary Judgment Motion is GRANTED.

## II.  Background

### A. Factual Background[4]

After a belated, home-based New Year's celebration with friends (*see* NW 56.1 Statement, ¶¶15, 17, 19-20), in the early morning of January 3, 2014, the Keenan family members awoke and, between 7:00 a.m. and 8:00 a.m., Mother began breastfeeding three-month-

---

[3]  Plaintiffs' Opposition was also filed as ECF No. 151.

[4]  Unless otherwise indicated, the facts are taken from the Northwell Defendants' Local Rule 56.1 Statement (hereafter, the "NW 56.1 Statement")(*see* ECF No. 148-5), and Plaintiffs' Local Rule 56.1 Statement (hereafter, "Plaintiffs' 56.1 Statement")(*see* ECF No. 151-1). Unless otherwise stated, a standalone citation to a Rule 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Citation to a party's Rule 56.1 Statement incorporates by reference the documents cited therein, if any. Pinpoint citation to the Northwell's 56.1 Statement will use the paragraph symbol ("¶") before the cited paragraph, while pinpoint citation to paragraphs in the Plaintiffs' 56.1 Statement will be connoted by bracketed numbers (*e.g.*, "[#]"). (*See also infra* at note 12.)

old Lana.  (*See id.*, ¶23.)  After finishing feeding, Lana feel asleep.  (*See id.*, ¶24.)  At

approximately 9:15 a.m., Mother went downstairs to cook breakfast, leaving Lana alone, on her

back, and in the middle of the Parents' bed.  (*See id.*, ¶25.)  Father went outside to shovel snow.

(*See id.*, ¶26.)  "Nobody went upstairs to check on [Lana] for as much as an hour and forty-five

minutes until after [Father] was called back into the home for breakfast."  (*Id.*, ¶27.)

"After entering the home, [Father] immediately went upstairs and found [Lana] face-

down on the bed in vomit [and] on her stomach."  (*Id.*, ¶28; *cf.,* Plaintiffs' 56.1 Statement, [1].)

She was not breathing.  (*See id.*, ¶¶29, 31, 42; *cf.,* Plaintiffs' 56.1 Statement [1], [2].)  Father

carried Lana downstairs where CPR was performed on the infant, getting her to breathe again.

(*See id.*, ¶¶31-33; *cf.,* Plaintiffs' 56.1 Statement, [2].)  Thereafter, Lana was transported by

ambulance to Southside.  (*See id.*, ¶¶35, 39; *cf.,* Plaintiffs' 56.1 Statement, [3].)  According to the

ambulance call report, *inter alia*, Lana "began to regain more consciousness during transport and

began to cry, no other findings upon exam," and had a "strong brachial pulse."  (*See id.*, ¶7

(internal quotation marks omitted).)

Lana was taken to the hospital's Emergency Department ("ED") at 11:17 a.m. (*see id.*,

¶39; *see also* Plaintiffs' 56.1 Statement, [3]), and, after being triaged, was administered Narcan.

(*See id.*, ¶42; *see also* Plaintiffs' 56.1 Statement, [5].)  Thereafter, the attending ED doctor

ordered tests be performed on Lana's blood, which "all evidenc[ed] severe metabolic acidosis,

which is a life-threatening condition."  (*Id.*, ¶43.)  Subsequently, "[s]everal medications were

administered prior to and concurrent with [Lana]'s intubation," *i.e.*, Ativan, Versed, Lidocaine,

and Propofol.  (*Id.*, ¶44; *see also* Plaintiffs' 56.1 Statement, [5].)  Additionally, "[a]mong the

tests ordered and performed at Southside was a brain computerized tomography scan ("CT

scan") without contrast, entered at 11:54 AM, and performed after 12:56 PM.  The CT scan was

read by Yasser Mir, MD, the attending radiologoist, at 1:09 PM." (*Id.*, ¶48.) His findings "were suspicious for early global hypoxic injury" and, therefore, he recommended an MRI. (*Id.*, ¶49; *cf.*, Plaintiffs' 56.1 Statement, [6] ("At 1:09 p.m., a CT scan of Lana's brain showed early signs of Hypoxic Ischemic Encephalopathy (HIE), a condition caused by lack of oxygenated blood flow to the brain."). Later that day, Lana was transferred to CCHC, a level one pediatric trauma center which handles complex trauma cases (*see id.*, ¶ 51; *see also* Plaintiffs' 56.1 Statement, [8], [9]), where she was admitted and remained through her death on February 6, 2014. (*See id.*, ¶¶ 53, 54.)

Ophthalmology resident Jing Lee, MD: evaluated Lana on January 3, 2014 at 4:40 p.m. (*see id.*, ¶56); found "two retinal hemorrhages of the left eye described as: (1) retinal hemorrhage with central whitening, and (2) flame shaped sub-retinal hemorrhage" (*id.*); and, discussed those findings with attending physician Majida Gaffar who, after evaluating Lana on January 4, 2014, "confirmed the presence of two faint intra-retinal hemorrhages, without peripheral hemorrhage." (*Id.*, ¶57.)

> Also on January 3, 2014, [Lana] was evaluated by a pediatric neurology fellow and pediatric attending physician. The examinations documented that [Lana] was intubated, sedated, and required pressor support after administration of Propofol and Versed prior to and during intubation induction. Also documented was a reported history of eye deviation, but the examination was limited secondary to the paralytics administered. The plan included performing an EEG on January 4, 2014, and to monitor for continued seizure activity.

(*Id.*, ¶58.) Later that evening, at approximately 11 p.m., a social worker documented that she consulted with Hoffman-Rosenfeld, the pediatric abuse specialist, and that the Parents were made aware of the availability of social work services and support. (*See id.* ¶59.)

On January 4, 2014, a CT scan revealed Lana had worsening HIE with cerebellar infarcts (hereafter, the "January 4th Scan"). (*See id.*, ¶60 (referencing Sharon Dial, MD, a Pediatric Intensive Care Unit ("PICU") intensivist).) That morning, Hoffman-Rosenfeld consulted with the Parents, including repeating "the pertinent history from Southside" and "the finding of retinal hemorrhages". (*Id.*, ¶61.) Her "physical examination of the infant was unremarkable, although she documented that on examination by the ophthalmology resident, two retinal hemorrhages were detected; they were awaiting further examination by the attending physician." (*Id.*, ¶64.") Hoffman-Rosenfeld's notes further indicate that she explained to the Parents: "that many tests were going to be done to help understand the etiology of this episode and that a comprehensive evaluation for traumatic injury was being conducted because traumatic injury was part of the differential diagnosis . . . that there was unexplained hypoxic ischemic encephalopathy in an infant who was previously well" (*id.*, ¶ 65); and "if injury or a marker of possible injury, for example, retinal hemorrhages, [is] found, a report to the New York State Central Registry might be made – and that the [Parents] expressed understanding" (*id.*, ¶66).

Later that afternoon, a physician assistant: evaluated Lana; noted, *inter alia*, that the January 4th Scan "showed infarcts with global ischemic injury" and "no signs of head trauma"; and discussed the case with Mittler, the neurosurgery attending physician, who opined that Lana's "prognosis was extremely poor". (*Id.*, ¶¶67, 68.) Mittler, *inter alia*: spoke about Lana's case with Hoffman-Rosenfeld and Dr. Dial; agreed with the plan to conduct an MRI of Lana's brain; and "opined that[,] as the event etiology remained unclear, non-accident injury must be included in the diagnosis." (*Id.*, ¶¶68, 69.)

Also on January 4, 2014, "[a]fter consulting with . . . Hoffman-Rosenfeld, social worker Elyse Davidson, MSW[,] contacted the Statewide Central Register of Child Abuse and

Maltreatment and made a mandated report of suspected child abuse based on [Lana]'s condition." (*Id.*, ¶ 70.) Sometime thereafter, a CPS employee arrived at Lana's bedside to meet the Parents (*see id.*, ¶ 72), as did members of the Suffolk County Police Department to interview them (*see id.*, ¶73).

On January 5, 2014, Mittler, together with a PICU doctor, had a discussion with the Parents addressing "the evolution of HIE with brain swelling and herniation" as well as Lana's "grim prognosis". (*Id.*, ¶74.) He also reviewed a CT scan performed that day, leading to his reconfirmation "that there was no neurosurgical intervention that would provide benefit." (*Id.*, ¶77; *see also id.*, ¶75 (discussing CT scan interpretation by Dr. Nguyen), ¶77 ("Mittler personally evaluated the infant on January 6, 2014 and restated his findings.").)

On January 6, 2014, "Hoffman-Rosenfeld re-consulted . . . and documented that two unilateral retinal hemorrhages were seen, and although the pattern was nonspecific and although traumatic injury was in the differential diagnosis, they were not conclusive evidence of trauma or abuse." (*Id.*, ¶ 78.) CPS employees Peterson and Pidel "were both provided a medical update." (*Id.*, ¶79.) Thereafter, various CPS personnel participated in a case conference regarding Lana during which information from Hoffman-Rosenfeld was presented, *to wit*: Hoffman-Rosenfeld's "assessment of the infant was 'inconclusive'"; "there was no conclusion of child abuse"; and that the doctors "were continuing to assess for possible organic causes of [Lana]'s condition" (*id.*, ¶80).

On January 7, 2014, an MRI was performed on Lana (*see id.*, ¶81 ("The plan was to do an MRI of the head, neck and spine."), ¶ 82 (discussing MRI scan interpretation by Dr. Warshall)), as was an MRV (*i.e.*, Magnetic Resonance Venography) (*see id.*, ¶¶83, 84

(discussing MRV interpretation by Dr. Warshall)), and a skeletal survey (*see id.*, ¶85 (discussing skeletal survey interpretation by Dr. Collins)).

On the morning of January 8, 2014, Lana's MRI was reviewed "with neuroradiologists Dr. Warshall, Dr. Alan Johnson and Dr. Barry Shpizner, pediatric neurology attending physician Dr. Laurta, and Dr. Mittler's partner, pediatric neurosurgeon Dr. Steven Schneider." (*Id.*, ¶87.) Further, Hoffman-Rosenfeld re-evaluated Lana and, after the MRI review, meet with the Parents "along with Dr. Siegel, PICU intensivist Dr. Glater, and PICU social worker Cristen Gilleran, LCSW." (*Id.*, ¶87.) The Parents questioned whether Lana's injuries could have happened: from her head flopping back when Father carried her downstairs; from Father giving her blows on the neck when trying to revive her; when a police officer slipped on a wet floor when he was carrying Lana from the house; or by one of Lana's Brothers possibly going upstairs and injuring the baby. (*See id.*, ¶ 88.) In response, "Hoffman-Rosenfeld explained that in any scenario this injury was not explained by those mechanisms;" rather, "this type of neck injury could be from hyperreflexia or hypertension as seen with shaking." (*Id.*, ¶89.) Further, since "the findings in the neck indicated a traumatic injury", that information would be communicated to CPS, which it was. (*See id.*, ¶¶89-90.)) Mittler's similar findings were, likewise, conveyed to CPS. (*See id.*, ¶¶91-92.)

Thereafter,

> CPS made a decision to initiate proceedings [*i.e.*, filing the Pre-Petitions] in the Family Court naming the [Parents] as respondents. Dr. Hoffman-Rosenfeld was consulted for her medical input beforehand, along with police and other persons that CPS spoke to, but was not present when CPS employees reached their decision to proceed in Family Court. Dr. Hoffman-Rosenfeld opined that the injuries evidenced by the assessment and diagnostic imaging were consistent with a traumatic injury, and absent a reported or identified history of accidental trauma, non-accidental trauma could not be ruled out.

> Dr. Hoffman-Rosenfeld had no foreknowledge that CPS
> was going to be instituting proceedings against the [Parents] in the
> Family Court.

(*Id.*, ¶¶93-94.)  Orders of Protection were issued on January 9, 2014 which, *inter alia*, prevented the Parents from having any contact with Lana other than a visit for her christening.  (*See id.*, ¶96; *see also id.*, ¶ 95 (Brothers directed to be place in custody of their maternal grandparents); *cf.*, Plaintiffs' 56.1 Statement, [12].)

On January 10, 2014, Gilleran provided CPS's Peterson with an update regarding Lana. (*See id.*, ¶97.)  On January 13, 2014, CPS caused Petitions to be filed with Family Court commencing the Protective Proceedings against the Parents.  (*See* Plaintiffs' 56.1 Statement, [13] ("On January 13, 2014, a petition alleging severe abuse was filed in the Family court alleging that Lana sustained widespread bleeding in her brain, spinal cord injury, and injuries to her neck ligaments and further, that the injuries are those as seen when shaking an infant."); *see also* County Summary Judgment Order at 4-5.[5])  Thereafter, on January 16, 2014, another hearing was held in Family Court, after which the Family Court judge "ordered that the [Parents] would be permitted to be present at the hospital when [Lana] was declared brain dead and that both they and [Lana]'s maternal grandparents would be permitted to stay with the decedent at the hospital until she was brought to the morgue."  (NW 56.1 Statement, ¶100.)

---

[5]  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, *but it may consider other materials in the record*." (emphasis added)).  The Court notes that while the Northwell Defendants do not mention the January 13th filings of the Petitions in their Rule 56.1 Statement, it is not a disputed fact and is included to provide a more complete chronology of the relevant events.

Lana passed away on February 6, 2014.  (*See id.*, ¶¶107-108; Plaintiffs' 56.1 Statement, [14].[6])  On February 9, 2014, City Medical Examiner Dr. Kia Newman (hereafter, "Medical Examiner") performed an autopsy on Lana's body.  (*See id.*, ¶109; *cf.*, Plaintiffs' 56.1 Statement, [14].)  The stated "cause of death was complication of anoxic ischemic encephalopathy of undetermined etiology and the manner of death was undetermined."  (*Id.*, ¶113.)  "Nothing contained in the autopsy contradicted the clinical findings made during the course of [Lana]'s care and treatment."  (*Id.*, ¶112.)

A trial was held in Family Court[7] to determine whether the Brothers were subject to derivative abuse and neglect. (*See id.*, ¶ 116; *see also* Family Court Order at 1, *attached as* Ex. Y (ECF No. 161-3) to Rosof Decl.)  In addition to Drs. Johnson and Mittler testifying (*see id.*), Hoffman-Rosenfeld testified at the trial[8] that Lana's "injuries were consistent with non-accidental trauma, in light of the objective findings on diagnostic imaging prior to [her] death." (*Id.*, ¶117.)  She "did not testify as to any particular diagnosis, assign a medical diagnosis of child abuse, or attribute [Lana]'s injuries to a specific individual or moment in time."  (*Id.*)

While the Family Court judge found "[t]he [P]arents [did] not provide[] a sufficient explanation for Lana's neck/ligamentous injury," there was also "insufficient evidence to prove that Lana suffered from a traumatic neck injury."  (Family Court Order at 24.)  Indeed, as the

---

[6]  While the Northwell Defendants indicate Lana passed away on February 7th, the Court has determined to recognize the February 6th date identified by the Plaintiffs, noting the difference in date is immaterial to its determination of the Summary Judgment Motion.

[7]  Although non-dispositive to the present Motion, for clarity the Court notes that there were actually two trials, with the second Family Court trial being necessitated by the recusal of the judge presiding over the initial trail on the Petitions.  (*See* NW 56.1 Statement, ¶ 116.) References hereafter to the Family Court trial are to the second trial.

[8]  During the Family Court trial, "[a]ll counsel stipulated to these doctors being recognized as experts in their field."  (Family Court Order at 12.)

Family Court judge wrote, while "[t]he credible medical testimony indicated there were 'signs of trauma' or that 'trauma is highly suspicious,'" (*id.*), as Dr. Johnson testified, "the best way to determine whether there is ligament injury is through an autopsy." (*Id.* at 23.) Since the Medical Examiner "took special care to preserve the tissues and ligaments surrounding the neck" and "specifically looked for signs of traumatic injury," but "found none" (*id.* at 24; *see also* NW 56.1 Statement, ¶118 ("Placing particular emphasis on the autopsy report and testimony of [the Medical Examiner], who was called as a court witness . . . , the [Family C]ourt found that the manner of [Lana]'s death was undetermined.")), the Family Court ultimately found, *inter alia*, that the County Defendants had "failed to establish by a preponderance of the evidence that Lana [] was an abused, severely abused or neglected child." (*Id.* at 25-26; *see also* NW 56.1 Statement, ¶121; *cf.*, NW 56.1 Statement, ¶120 (stating that the Family Court found is did "no[t] need to reach the issue of whether there was neglect in this particular case" because the Brothers' needs were "significantly different" from the "special circumstance . . . that were specific only to Lana").) The Petitions against the Parents were ordered dismissed (*id.* at 26) and the Brothers were returned to their Parents (*see* Plaintiffs' 56.1 Statement, [16]).

### B. Procedural History

Alleging medical malpractice and civil rights violations, on January 12, 2016, Plaintiffs commenced this action (*see* ECF No. 1), which was originally assigned to District Judge Wexler (*see* ECF No. 1-1.). On June 27, 2016 and pre-answer, the Northwell Defendants moved to dismiss the Complaint pursuant to Rules 12(b)(1) & (6) of the Federal Rules of Civil Procedure (*see* ECF Nos. 59 (Notice of Motion to Dismiss), 60 (Motion to Dismiss)). Thereafter, on October 5, 2016, the Plaintiffs sought permission to amend their Compliant. (*See* ECF No. 83.) While the Northwell Defendants' dismissal motion and Plaintiffs' amendment motion were

pending, Judge Wexler recused himself from the case, which was randomly reassigned to the undersigned. (*See* Case Docket, Dec. 13, 2016 ELECTRONIC ORDER OF RECUSAL). Thereafter, this Court scheduled a December 19, 2016 Status Conference. (*See* Case Docket, Dec. 14, 2019 NOTICE of Hearing.)

At the December 19th Status Conference, among other things, this Court terminated all pending dismissal motions with leave to refile as summary judgment motions upon close of discovery; a September 11, 2017 discovery deadline was set. (*See* Case Docket, Dec. 19, 2017 Minute Order (ECF No. 96).) Thereafter, on March 14, 2017, the Magistrate Judge entered an order granting Plaintiffs' motion to amend their complaint and directing Plaintiffs' counsel "to serve and file the amended complaint forthwith." (Case Docket, Mar. 14, 2017 ELECTRONIC ORDER (AYS).) On March 27, 2018, Plaintiffs filed their Amended Complaint (*see* ECF No. 108) raising numerous claims, including several § 1983 claims, *to wit*:

> 1. pursuant to § 1983, the malicious prosecution of Parents by certain County Defendants, allegedly prompted by "Hoffman-Rosenfeld, acting as a civilian and under color of law, [who] was instrumental in the commencement, investigation, and continuation of" the Protective Proceedings, and with Hoffman-Rosenfeld allegedly "tampering with a witness in order to create the appearance of probable cause by attempting to persuade the Queens [County] Medical Examiner to alter her findings" (*see* Count 1; *id.*, ¶¶181, 188);
> 2. pursuant to § 1983, and as to the Northwell Defendants, abuse of process based on their alleged "manipulate[ion of] medical conclusions and records in order to file and continue the false and phony 'Shaken Baby' accusation offered so as to cover up their gross malpractice in their treatment of Lana," as well as the alleged "false and misleading statements and testimony [of Hoffman-Rosenfeld and Mittler] during the course of the Family Court proceedings and investigation (*see* Count 2; *id.*, ¶¶201, 203);
> 3. pursuant to § 1983, a conspiracy to permit and condone the use of false and misleading testimony against the Parents during the Protective Proceedings, as well as the alteration and manipulation

of medical records, the use of which interfered with the Plaintiffs'
constitutional rights, *i.e.*, freedom of association and the
fundamental rights inherent in the familial relationship (*see* Count
3);

4. pursuant to § 1983, the intentional violation of Plaintiffs'
constitutional rights to familial association rights because of
Lana's and the Brothers' removal from their Parents' custody (*see*
Count 4);

5. pursuant to § 1983, a *Monell* claim based on the alleged
adopted custom and practice of CPS and DSS of having private
citizens – in this case, Hoffman-Rosenfeld – perform their
investigative work, upon which CPS and DSS rely, and which
resulted in constitutional injury (*see* Count 5); and

6. pursuant to § 1983 (and state law), a claim of false
imprisonment based on Hoffman-Rosenfeld, acting under color of
law, being instrumental in "the obtaining of Orders of Protection
and removal of the children" (*see* Counts 6, 11-15).

On April 10, 2017, the Northwell Defendants answered the Amended Complaint denying the

majority of Plaintiffs' allegations and raising various affirmative defenses. (*See* ECF No. 111.)

On February 2, 2018, the Northwell Defendants moved for summary judgment in their favor as

to all the claims raised by Plaintiffs. (*See* Support Memo at (unnumbered) 1.)

### C. *The Parties' Positions*

#### 1. The Defendants' Position[9]

The Northwell Defendants assert that this case is "in essence an attempt by [Lana]'s

parents to shift the blame for their daughter's unquestionably heartbreaking death to alleged

'medical malpractice' by the Northwell Defendants, who attempted to save her life but were

---

[9] In moving for summary judgment, the Northwell Defendants initially raised an argument that
this Court lacked subject-matter jurisdiction over this lawsuit (*see* Support Memo at 2-3, 4-5),
but have subsequently withdrew that argument (*see* Reply at 1, note 2). Further, only the
Northwell Defendants' arguments regarding Plaintiffs' § 1983 causes of action are discussed
herein. (*See also* at p. 47 (discussing the Court's determination to decline supplemental
jurisdiction over Plaintiffs' state law causes of action).)

prevented from doing so by the severity of the injuries she sustained at home before she ever entered their care." (Support Memo at 2).) In essence, the Northwell Defendants argue that the Plaintiffs are trying to morph their "garden-variety claims of medical malpractice" into a "civil rights lawsuit (requesting attorney's fees pursuant to 42 U.S.C. § 1988)" by weaving "a circular tale of a conspiracy between child-abuse-identification and prevention specialists and governmental child-care protection agencies to 'frame' [P]laintiffs as part of a 'cover up' of their respective purported institutional failings." (*Id.*) However, since there is no evidence that any Northwell Defendant acted under color of state law, all of Plaintiffs' § 1983 claims against them should be dismissed. (*See id.* at 5-6.) Alternatively, if they are found to have been acting under color of state law, the Northwell Defendants claim qualified immunity should shield them from any § 1983 liability. (*See id.* at 6-8.)

More particularly, the Northwell Defendants contend that there is no evidence supporting Plaintiffs' claimed conspiracy, rendering their abuse of process and conspiracy causes of action (*i.e.*, Second and Third Causes of Action) unsustainable. (*See id.* at 8-11.) Asserting that the Plaintiffs' conspiracy theory is convoluted (*see id.* at 9), the Northwell Defendants state that: its employees are mandatory reporters of suspected abuse (*see id.*); Hoffman-Rosenfeld testified that Lana's unexplained severe injuries were "consistent with" non-accidental trauma, but "she did not offer any particular diagnosis, assign a medical diagnosis of child abuse or attribute [Lana]'s injuries to a specific individual or moment (*id.* at 10 (citing Northwell's 56.1 Statement, ¶117)); and "there is no evidence that any Northwell Defendant witnesses at the [Family Court] trial, or any other witness, committed perjury, or that the Northwell Defendants altered and manipulated the contents of medical records, filed false records with the County, or tampered with witnesses" as alleged (*id.* (citing Amended Complaint, ¶¶ 314, 316, 210-12)). They argue:

"This is not the stuff of conspiracy." (*Id.*) Rather, at most, what Plaintiffs have done is "alleged two distinct intra-corporate conspiracies," *i.e.*, one amongst the Northwell Defendants to protect themselves from being sued for medical malpractice, and another one amongst the County Defendants to suppress their own malfeasance in continuing the Protective Proceedings, which conspiracies are divergent and do not evidence any agreement among those parties. (*See id.* at 11.)

Moreover, in addition to lack of state action and, alternatively, entitlement to federal qualified immunity, the Northwell Defendants argue that as to the § 1983 malicious prosecution claim: (1) it is not clearly established in the Second Circuit whether a civil proceeding in Family Court can give rise to a malicious prosecution claim (*see id.* at 12 (citing *Washington v. County of Rockland*, 373 F.3d 310, 315-16 (2d Cir. 2004); *Orlik v. Duchess County*, 603 F. Supp.2d 632, 649 (S.D.N.Y. 2009)); (2) probable cause existed at the time the Protective Proceedings were instituted (*see id.* at 14-15 (citing *Cornejo v. Bell*, Nos. 04-cv-341, 06-cv-2910, 2008 WL 5743934, at *12 (E.D.N.Y. May 19, 2008); *Oka v. County of Suffolk*, No. 11-cv-2578, 2015 WL 918762, at *8-9 (E.D.N.Y. Mar. 2, 2015)); and (3) "although ***the Family Court petitions were dismissed in a technical sense, they were not exactly 'terminated in the plaintiff's favor,' substantively*** as required to make out a claim" (*id.* at 15 (bold and italic emphasis in Support Memo)(quoting *Allen v. Antal*, No. 12-cv-8024, 2014 WL 2526977, at *16 (S.D.N.Y. Mar. 13, 2014)).

As to Plaintiffs' § 1983 abuse-of-process claim, in addition to the absence of a conspiracy (*see supra*), the Northwell Defendants posit that they are entitled to summary judgment: (1) "'because the abuse of civil process may not give rise to a claim of abuse-of-process . . . under Section 1983 . . . .'" (*Id.* at 16 (quoting *Douglas v. N.Y.S. Adirondack Park Agency*, 895 F.

Supp.2d 321, 349 (N.D.N.Y. 2012)(emphasis in *Douglas*)); (2) Hoffman-Rosenfeld was unaware of CPS's decision to commence the Protective Proceedings until after the fact (*see id.* at 17); and (3) "the theory or conjecture that CPS's independent governmental decision to commence proceedings in the Family Court was motivated by a collateral purpose to divert attention from alleged malpractice at Southside is utterly conclusory and not supported by a shred of evidence." (*Id.*)

To the extent Plaintiffs assert in their Fourth Cause of Action an intentional violation of federally protected constitutional rights based on their rights to be together as a family, the Northwell Defendants argue that the CPS workers had a reasonable basis for bringing the Protective Petitions (*see id.* at 18) and "[d]iscovery has uncovered no facts that would suffice to prove that the actions of the Northwell Defendants, who merely reported suspected abuse and cooperated as required with governmental authorities, meet th[e] demanding standard" of demonstrating a "caseworker's actions were 'shocking, arbitrary, and egregious.'" (*Id.* (quoting *Shapiro v. Kronfeld*, No. 00-cv-6286, 2004 WL 2698889, at \*16 (S.D.N.Y. Nov. 24, 2004)).) Rather, the Northwell Defendants assert that, given the facts of this case, it would have been a dereliction of duty of the individual Northwell Defendants to not report the suspected abuse; hence, "the claim that the Northwell Defendants intentionally violated the Keenans' substantive due process rights by communicating and cooperating with CPS is baseless." (*Id.* at 19.)

Regarding the Plaintiffs' *Monell* Cause of Action, the Northwell Defendants argue that, as to them, this claim cannot be sustained because: (1) there are no allegations of a policy or custom on the part of the Northwell Hospital Entities; (2) there are no allegations that any of the individual Northwell Defendants was a policymaker (*see id.*); and (3) there is no evidence of any

policy or custom at Northwell (*see id.* at 20[10] ("In fact, plaintiffs' counsel never even examined

Dr. Hoffman-Rosenfeld, Dr. Mittler, Dr. Mir., Dr. Sood or Dr. Avcioglu at their depositions

about any such policy or custom at Northwell to accept delegations of governmental

investigative and prosecutorial powers from the government (Exs. K, L, S, U, J).")). Therefore,

summary judgment in the Northwell Defendants' favor as to the Plaintiffs' *Monell* claim is

warranted.

Finally, as to Plaintiffs' last § 1983 cause of action, fashioned as a claim of false

imprisonment, the Northwell Defendants advance:

> The Complaint is somewhat vague as to who was allegedly falsely
> imprisoned, referring only to a restraint on the Keenan Family
> members' rights to familial association. To that extent, this claim
> appears duplicative of the substantive due process claim in Count 4
> . . . and as such subject to dismissal as a redundant theory. It is
> also unclear how the Keenans could claim to have been
> "imprisoned" by the issuance of temporary orders of protection.
> To the contrary, case law reflects that in such a circumstance,
> '[a]dult Plaintiffs have not been seized . . . ." *Estiverne* [*v.
> Esernio-Jenssen*], 833 F. Supp.2d [356,] 380 [(E.D.N.Y. 2012)];
> *Emerson* [*v. City of N.Y.*], 740 F. Supp.2d [385,] 392-93[(S.D.N.Y.
> 2010)] (dismissing a § 1983 malicious prosecution claim in the
> context of an abuse investigation, where plaintiff father had not
> himself been seized).

---

[10] The Northwell Defendants also state:

> Indeed, in their prior Rule 12 briefing, plaintiffs confirmed in their
> memorandum of law in opposition to the County's motion to
> dismiss that plaintiffs are complaining of a "custom policy and
> practice by which CPS wrongfully delegates its investigative and
> prosecutorial powers to civilians . . . which directly resulted in
> constitutional injury." Because the plaintiffs admitted that their
> *Monell* claim concerns *the County's* policy and custom, it should
> be dismissed against these movants.

(Support Memo at 20 (emphasis in original)(referring to ECF No. 62 at 23).)

(Support Memo at 21.)  Further, as Lana was receiving continuous treatment until her death and not being held solely for investigative purposes, the Northwell Hospital Entities are not subject to § 1983 liability.  (*See id.* at 21-22 (citing *Estiverne v. Esernio-Jenssen*, 910 F. Supp.2d 434, 442 (E.D.N.Y. 2012).)  Nor can any § 1983 liability be had on this claim regarding the Brothers since the Parents consented to the Brothers staying with their maternal grandparents.  (*See id.* at 22.)

### 2.  The Plaintiffs' Position

The Plaintiffs counter that "based on the facts, reasons and rationale provided," the Northwell Defendants: "clearly crossed the line" from "mere witnesses" to "State actors operating under color of law"; they are not entitled to any immunity; the Protective Proceedings, as quasi-criminal matters, satisfy the Fourth Amendment criteria necessary to proceed with § 1983 claims; and, as to Plaintiffs' "specific claims," "there are legitimate factual disputes that only a jury can resolve."  (Opp'n at 1.)  Plaintiffs' counsel contends "Defendants and their counsel have missed a major point of this litigation," stating, *inter alia*:

> [T]his § 1983 action does not turn on whether the medical records and imaging reports are correct or "within the standard of care," nor does it turn on whether or not the Northwell Defendants were justified in "making a report."  The case turns on whether or not the [P]etitions that so clearly impacted Plaintiffs' Fourth Amendment personal liabilities and supplied probable cause were false, misleading, or recklessly made and whether or not the State actors proceeded with callous indifference to the detriment of the Plaintiffs' civil rights.

(*Id.* at 2.)  They claim their "case is simple:  the Northwell Defendants exploited the ignorance, laziness, and admitted incompetence of the CPS workers, thereby contributing to the creation of a false and misleading 'shaken baby' allegation resulting in Orders of Protection and removal."  (*Id.* at 29.)

Plaintiffs argue "that the source of the false information which led to this emotionally devasting constitutional violation was, in particular, Northwell Defendants Hoffman-Rosenfeld, Gilleran and Mittler [(*i.e.*, the Northwell Trio)] who, because of their virtual monopoly over the medical information, caused this patent constitutional violation by convincing CPS to prosecute [the Parents]." (*Id.* at 2-3; *see also id.* at 10-12.) They assert that the Northwell Trio, acting in concert with the County Defendants, were "part of the investigative team and an integral part of the prosecutorial apparatus acting more like detectives than doctors;" and "were State actors instrumental in the initiation and continuance of the prosecution [of the Protective Proceedings] and are therefore accountable under § 1983." (*Id.* at 25; *see also id.* at 26 ("A private individual can also be found to have acted under color of law if the private actor 'is a willful participant in joint activity with the State or its agents.'" (quoting *Ciambriello v. County of Nassau*, 292 F.3d 312, 324 (2d Cir. 2002)); 27.) However, notwithstanding the deference afforded CPS caseworkers, because of the egregious constitutional harm suffered by the Plaintiffs, the Northwell Defendants are precluded from raising the shield of qualified immunity. (*See id.* at 23-25.)

More specifically and as to their malicious prosecution cause of action (*i.e.*, Count 1), Plaintiffs focus on Hoffman-Rosenfeld and her alleged malice, supposedly exemplified by her "unilateral decision to hide the fact that *none* of the images supported her '*shaken baby*' allegation." (*Id.* at 30 (emphasis in original).) They argue that "malice can be inferred by a lack of probable cause" and "once the autopsy, '*the gold standard*,' established no traumatic injury whatsoever, whatever probable cause that may have existed was erased altogether." (*Id.* at 30 (emphasis in original).) Plaintiffs contend, therefore, that Hoffman-Rosenfeld's "actions were objectively unreasonable and she acted with malice when making intentionally misleading

statements and withholding evidence." (*Id.* at 31 (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996)).)

Recognizing that the crux of an abuse of process claim is that "legal process was instituted to gain a collateral objective" (*id.* at 31), the extent of Plaintiffs' argument supporting their position that their abuse of process claim (*i.e.*, Count 2) "must go to the jury" is that:

> [T]he collateral objectives are well defined in the Complaint and are a matter of context and common sense and include (i) the need to avoid malpractice liability by obtaining a finding of abuse against Plaintiffs; (ii) the need to avoid County liability by a false conviction and protecting Hoffman-Rosenfeld for economic gain; and (iii) gratification of professional ego and to advance standing as a pediatric abuse specialist. (Exs. "16" and "19")[.] *TADCO Const. Corp. v. Dormitory Auth. of N.Y.*, 700 F. Supp.2d 253, 271-72 (E.D.N.Y. 2010).

(*Id.* at 31-32.)

As for their conspiracy cause of action (*i.e.*, Count 3), relying on the Northwell Defendants' statement of the relevant law,[11] Plaintiffs assert: (1) that the Northwell Trio "are clearly 'State actors'" thereby establishing the first element of a conspiracy claim; (2) without citation to the record, that the Northwell Trio intended "to break [the Keenan] family apart by misuse of the removal proceeding"; and (3) the Northwell Defendants' failure to disclose certain medical evidence and their mispresenting other such evidence (citing Ex. 25). (*Id.* at 32.) Opaquely, Plaintiffs state, "It is entirely reasonable to conclude that this conspiracy formed over time and was at its worst following the autopsy." (*Id.*) They argue that this cause of action must be presented to the jury. (*See id.*)

---

[11] "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages." (Support Memo at 9 (quoting *Conte v. County of Nassau*, No. 06-cv-4746, 2010 WL 3924677, at *24 (E.D.N.Y. Sept. 30, 2010)).)

The extent of Plaintiffs' argument supporting their claim of an intentional violation of

their constitutional rights to familial association (*i.e.*, Count 4) going before a jury is:

> [h]ere, we have a case where Hoffman-Rosenfeld (i) knew she was
> reporting to CPS; (ii) that CPS would file removal petitions based
> upon her opinions; and (iii) lied and misled the painfully
> incompetent CPS workers. This is all that is necessary to make out
> a case for an intentional violation claim and punitive damages.

(*Id.*) There is no discussion of applicable law or citation to the record.

Plaintiffs do not address the Northwell Defendants' arguments regarding their *Monell*

cause of action (*i.e.*, Count 5); nor is there any mention of the § 1983 false imprisonment cause

of action (*i.e.*, Count 6) in Plaintiffs' Opposition.

III.  Discussion

   A.  *Applicable Law*

      1.  Motion for Summary Judgment Standard

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v.

M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P.

56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary

judgment motion, the district court must first "determine whether there is a genuine dispute as to

a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557

U.S. 557, 129 S. Ct. 2658, 2677 (2009) ("On a motion for summary judgment, facts must be

viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as

to those facts." (emphasis added; internal quotations and citation omitted). On a motion for

summary judgment, "[a] fact is material if it 'might affect the outcome of the suit under the

governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 823 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248); *accord Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372,

380, 127 S. Ct. 1769 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87), and must offer

"some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v.*

*Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The

nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury

could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012)

(quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient' to defeat a summary judgment

motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at

252); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions."

*DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*,

913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as

to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United*

*States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and

draw all permissible factual inferences in favor of the non-moving party, . . . conclusory

statements, conjecture, or speculation by the party resisting the motion will not defeat summary

judgment[.]" (quotations, alterations and citations omitted)); *Elliott v. Gouverneur Tribune*

*Press, Inc.*, No. 13-cv-055, 2014 WL 12598275, at *2 (N.D.N.Y. Sept. 29, 2014) ("[I]t is well-

settled that a party opposing a motion for summary judgment may not simply rely on the

assertions in its pleadings." (citing *Celotex Corp., v. Catrett*, 477 U.S. 317, 324 (1986); further

citation omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely

colorable, . . . or is not significantly probative, . . . summary judgment may be granted."

*Anderson*, 477 U.S. at 249-50 (quotations and citations omitted).

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2187 (2017); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case[.]" (quotations, alterations and citation omitted)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's

claim." *Nick's Garage*, 875 F.3d at 114 (quotations and citation omitted); *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO ("In re DeRogatis")*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence." (quotations, alterations and citation omitted)).

### 2. Local Rule 56.1 Statements

When moving for summary judgment, in addition to complying with the Federal Rule of Civil Procedure 56, the parties must comply with Local Rule 56.1 of the United States District Courts of the Southern and Eastern Districts ("Local Rule 56"). As the Second Circuit has instructed, the Local Rule 56 "requirement is strict". *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009). Among other things, it:

> requires that any motion for summary judgment be accompanied by a list of the "material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. & E.D.N.Y. R.56.1(a). The nonmoving party *must respond to each numbered allegation in the moving party's statement* and include, if necessary, a statement of the additional material facts, as to which a genuine issue exists. S.D.N.Y. & E.D.N.Y. R. 56.1(b). In the typical case, failure to respond to a Rule 56.1 statement results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met. *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417-418 (2d Cir. 2009).

*Parris v. Acme Bus Corp.*, 956 F. Supp. 2d 384, 392 (E.D.N.Y. 2013)(emphasis added).

Furthermore, Local Rule 56.1(c) requires:

> Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party

> *will be deemed to be admitted* for purposes of the motion *unless*
> ***specifically*** *controverted* ***by a corresponding numbered***
> ***paragraph*** in the statement required to be served by the opposing
> party.

(Italicized and boldface emphasis added); *see also Giannullo v. City of N.Y.*, 322 F.3d 139, 140

(2d Cir. 2003)("If the opposing party then fails to controvert a fact so set forth in the moving

party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)); *Taylor &*

*Fulton Packing, LLC v. Marco Intern. Foods, LLC*, No. 09-cv-2614, 2011 WL 6329194, at *4

(E.D.N.Y. Dec. 16, 2011)("Where a nonmovant . . . files a deficient statement, courts frequently

deem all supported assertions in the movant's statement admitted and find summary judgment

appropriate." (footnote omitted)).  Moreover, to specifically controvert a statement of material

fact, a nonmovant is required to do so with specific citation to admissible evidence.  *See* Local

Rule 56(d); *see also Ezagui v. City of N.Y.*, 726 F. Supp.2d 275, 285 n.8 (S.D.N.Y. 2010)(noting

statements which a nonmovant does "not specifically deny–with citations to supporting

evidence–are deemed admitted for purposes of [movant's] summary judgment motion")

(collecting cases); *see also Universal Calvary Church v. City of N.Y.*, No. 96-cv-4606, 2000 WL

1745048, *2 n.5 (S.D.N.Y. Nov. 28, 2000).  As the Second Circuit has observed, "'where there

are no[] citations or where the cited materials do not support the factual assertions in the

Statements, the Court is free to disregard the assertion.'" *Holtz v. Rockefeller & Co., Inc.*, 258

F.3d 62, 74 (2d Cir. 2001) (quoting *Watt v. N.Y. Botanical Garden*, No. 98-cv-1095, 2000 WL

193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000); further citations omitted), *abrogated on other*

*grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009).  Indeed, "[w]here . . . the record does

not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded

and the record reviewed independently." *Id.* (citing *Zanghi v. Inc. Village of Old Brookville*, 752

F.2d42, 47 (2d Cir. 1985) (footnote omitted)).  Relatedly, it is not the role of the Court to search

the summary judgment record for evidence supporting a nonmovant's opposition. *See N.Y.S. Teamsters Conf. Pension & Ret. Fund. v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005)(recognizing authority of district courts to institute local rules governing summary judgment submissions, which permits courts "to efficiently decide" such motions "by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'" (further citations omitted)); *Ford v. Ballston Spa Cent. Sch. Dist.*, Nos. 05-cv-1198, 05-cv-1199, 2008 WL 697362, at *3 (N.D.N.Y. Mar. 13, 2008) (same); *Ohlson v. Cadle Co.*, No. 04-cv-3418, 2008 WL 4516233, at *5 (E.D.N.Y. Sept. 30, 2008)(admonishing counsel for failing "to provide any pinpoint citations to the deposition transcript or to direct the Court's attention to any particular testimony, apparently satisfied to have this Court hunt like a pig looking for truffles buried in the transcript" (citing as comparison to *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)("Judges are not like pigs, hunting for truffles buried in briefs.")).

### 3. § 1983 Causes of Action, Generally

Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the Unites States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983; *see also, e.g., Herring v. Suffolk County Police Dep't*, No. 17-cv-5904, 2018 WL 7150387, at *4 (E.D.N.Y. Oct. 19, 2018)("[T]o prevail on any claim brought pursuant to Section 1983, a plaintiff must demonstrate that he has been denied a constitutional right or federal statutory right and that the deprivation occurred under color of state law." (further citation and internal quotations omitted)) (report and recommendation), *adopted by* 2019 WL 402859 (E.D.N.Y. Jan. 31, 2019). It "is not itself a source of substantive rights"; rather, it "merely provides a method for vindicating federal rights

elsewhere conferred . . . ." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)(quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Lockwood v. Town of Hempstead*, No. 16-cv-3756, 2017 WL 3769253, at *2 (E.D.N.Y. Aug. 28, 2017 (stating § 1983 provides only a procedure for redress for the deprivation of rights established elsewhere)(adopting report & recommendation). "Therefore, to prevail on a claim arising under Section 1983, a plaintiff must establish: '(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law.'" *Lockwood*, 2017 WL 3769253, at *2 (quoting *Hawkins v. Nassau County Corr. Facility*, 781 F. Supp.2d 107, 111 (E.D.N.Y. 2011)).

    4. <u>Private Individuals and Entities as State Actors</u>

  "It is axiomatic that private citizens and entities are not generally subject to Section 1983 liability." *Hollman v. County of Suffolk*, No. 06-cv-3589, 2011 WL 280927, at *4 (E.D.N.Y. Jan. 27, 2011)(citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 323-34 (2d Cir. 2002). Thus, a plaintiff seeking to hold a private individual or entity liable pursuant to § 1983 must first demonstrate that person or entity acted under color of state law. *See K&A Radiologic Tech Servs., Inc. v. Comm'r of Dep't of Health*, 189 F.3d 273, 280 (2d Cir. 1999) ("Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" (citation omitted)); *Estiverne v. Esernio-Jenssen*, 910 F. Supp.2d 434, 442 (E.D.N.Y. 2012)(same)(quoting *K&A Radiologic*). "[A] private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'" *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)(quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)); *see also Estiverne*, 910 F. Supp.2d at 442 ("In addition, a private entity may be liable under § 1983 if it is

a 'willful participant in joint activity with the State or its agents." (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate' ('the public function test').

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)(quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see also Caballero v. Shayna*, No. 18-cv-1627, 2019 WL 2491717, at *3 (E.D.N.Y. June 14, 2019)(quoting *Sybalski*); *Herring*, 2018 WL 7150357, at *4 (same). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)(quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)); *Caballero*, 2019 WL 2491717, at *3 (quoting *Fabrikant*).

> (a.) *Joint Action Test*

> "Under the 'joint action' doctrine, a private actor can be found 'to act under color of state law for § 1983 purposes if . . . the private party is a willful participant in joint action with the State or its agents." *Hollman*, 2011 WL 280927, at *8 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)) (internal brackets omitted). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state agents]." *Forbes v. City of New York*, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). "Mere cooperation with a state official . . . is insufficient to establish state action." *Estiverne v. Esernio-Jenssen*, 910 F. Supp.2d 434, 442 (E.D.N.Y. 2012) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *San Filippo v. U.S. Tr. Co. of N.Y.*, 737 F.2d 246, 252, 256 (2d Cir. 1984)). Instead, "a plaintiff must show that the private citizen and the state official

> shared a common unlawful goal." *Hollman*, 2011 WL 280927, at
> *8 (internal quotations and citation omitted).

*Caballero*, 2019 WL 2491717, at *3.

(b.) *Public Function Test*

"To satisfy the state action requirement under the 'public function' test, the private entity

must 'perform a function that is traditionally the exclusive prerogative of the state.'" *Archer v.*

*Econ. Opportunity Comm'n*, 30 F. Supp.2d 600, 606 (E.D.N.Y. 1998)(quoting *Rendell-Baker*,

457 U.S. at 842); *see also Caballero*, 2019 WL 2491717, at *3 ("Under the public function test,

"[s]tate action may be found in situations where an activity that traditionally has been the

exclusive, or near exclusive, function of the State has been contracted out to a private entity."

(quoting *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264–65 (2d Cir.

2014) (internal quotations and citation omitted)); *Herring*, 2018 WL 7150387, at *5 (quoting

*Archer*).

(c.) *State Compulsion Test*

"[U]nder the 'state compulsion' test, a finding of state action requires that the private

entity 'acts pursuant to the 'coercive power' of the state or is controlled' by the state." *Herring*,

2018 WL 7150387, at *5 (quoting *Sybalski*, 546 F.3d at 258; further citation omitted). Stated

differently, "[u]nder the state compulsion test, 'a State normally can be held responsible for a

private decision only when it has exercised coercive power or provided such significant

encouragement, overt or covert, that the choice must in law be deemed to be that of the State.'"

*Caballero*, 2019 WL 2491717, at *4 (quoting *Doe v. Harrison*, 254 F. Supp.2d 338, 342

(S.D.N.Y. 2003); further citation omitted).

5. <u>Plaintiff's § 1983 Claims</u>

The Court refers to its County Summary Judgment Order (*see* ECF No. 180) and incorporates herein by reference the applicable law as to Plaintiffs' (a) Malicious Prosecution Claim (*see* County Summary Judgment Order, Part III(A)(4)); (b) Malicious Abuse of Process Claim (*see id.* at Part III(A)(5)); (c) Interference with Familial Association Claim (*see id.* at Part III(A)(6)); (d) Conspiracy Claim (*see id.* at Part III(A)(7)); and (e) *Monell* Claim (*see id.* at Part III(A)(8)). As will be discussed, *infra* at Part III(B), it is not necessary to reach the substance of these § 1983 claims against the Northwell Defendants.

6. <u>Qualified Immunity from § 1983 Liability</u>

> Individual defendants are "'shielded from liability for civil damages'" under 42 U.S.C. §1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed.2d 818 (1999)(quoting *Harlow* [*v. Fitzgerald*], 457 U.S. [800], 818 [(1982)]; *accord Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003)(quoting *Young v. Cnty of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)).

*Laster v. Mancini*, No. 07-cv-8265, 2013 WL 5405468, at *30 (S.D.N.Y. Sept. 25, 2013)(adopting report and recommendation). "Stated differently, an official is entitled to qualified immunity (1) if the plaintiff has not alleged a violation of a constitutional right, (2) if that right was not clearly established at the time of the conduct, or (3) if the official's actions were not objectively unreasonable in light of clearly established law." *Almonte v. City of Long Beach*, 478 F.3d 100, 109 (2d Cir. 2007) (citing *Harhay v. Town of Ellington Bd. of Educ.*, 323F.3d 206, at 211-12 (2d Cir. 2003)).

As the Second Circuit has described it, "qualified immunity provides a broad shield," thereby giving officials "'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 1244 (2012)). It "shields public officials from personal liability for official actions, 'unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known.'" *Almonte*, 478 F.3d at 108 (quoting *Harhay*, 323 F.3d at 211; further citation omitted).

In making determinations on qualified immunity claims, the Supreme Court requires a court to determine two matters, *i.e.*, whether the facts alleged by the plaintiff are sufficient to make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232(2009) (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)). It is within the court's discretion to determine which of the two inquiries to decide first. *See id.* at 236.

B. *The Instant Case*

1. Plaintiffs' Rule 56.1 Statement

In opposition to the Northwell Defendants' Summary Judgment Motion, in continued noncompliance with Local Rule 56.1(b) (*see, e.g.,* County Summary Judgment Order, Part III(B)(1)), which requires "a corresponding numbered paragraph responding to each numbered paragraph in the statement of the moving party," Plaintiffs' have submitted 16 unnumbered, non-corresponding, and predominantly unresponsive paragraphs to the Northwell Defendants' Rule 56.1 Statement, *to wit*:

> [1] - At 10:50 a.m. on January 3, 2014, Lana Keenan was found by her father in bed with vomit on her face, head, and bedding, unconscious and slightly cyanotic.

[2] - Immediately upon her being found in this condition, CPR was administered, and the child responded within seconds.

[3] - On January 3, 2014 at 11:17 a.m., Lana Keenan was admitted to S.S.H., located in Bay Shore, New York.

[4] - Upon her arrival, Lana was breathing normally, had a strong brachial pulse, perfect oxygen saturation, and normal blood pressure.

[5] - Between 11:37 a.m. and 12:22 p.m., Lana, a three-month-old, 12 lb. baby girl, was given Narcan, Ativan, Versed, and Propofol, after which she was intubated.

[6] - At 1:09 p.m., a CT scan of Lana's brain showed early signs of Hypoxic Ischemic Encephalopathy (HIE), a condition caused by a lack of oxygenated blood flow to the brain.

[7] - At 1:18 p.m., a transport team from Cohens [*sic*] Children's Hospital arrived at S.S.H.

[8] - At 2:21 p.m., Lana departed S.S.H. via ambulance to Cohen's [*sic*] Children's Hospital.

[9] - 50 minutes later, Lana arrives at Cohen Children's Hospital.

[10] - On January 4, 5, and 6, CT scans of Lana's brain show the natural progression of HIE and do not show any brain bleeds, subdural brain hemorrhages, or traumatic brain injury.

[11] - Notwithstanding the test results, on January 4, 2014, a report was made to the New York State Central Registry for abused and neglected children alleging that Lana was an abused child.

[12] - After the Suffolk Police (Special Victims Unit) closed the case as non-criminal, on January 9, 2014, a pre-petition removal application was made and, based upon its contents, Lana Keenan was placed in the care of Suffolk County while Plaintiffs Damien and Pierce Keenan were placed in foster care with their maternal grandparents. Simultaneous with the removal to foster care, Orders were issued prohibiting Sara and Padraig Keenan from having any contact whatsoever with any of their children. This translated to mean the parents were, under the threat of jail, barred from being bedside with their infant daughter.

[13] - On January 13, 2014, a petition alleging severe abuse was filed in the Family Court alleging that Lana sustained widespread bleeding in her brain, spinal cord injury, and injuries to her neck ligaments and further, *that the injuries are those as seen when shaking an infant*.

[14] - On February 6, 2014, Lana Keenan passed away, and a full autopsy, including an extraordinary neuropathology examination which required the intact removal of Lana's entire spine, spinal cord, and vertebra, was conducted.

[15] - A preliminary autopsy report revealed no trauma, and a final report dated June 24, 2014 concluded Lana suffered no traumatic injury to her brain, neck, or spine.

[16] - In February of 2015, after a trial, the case against Sara and Padraig was dismissed, and their surviving children were returned to them.

(Plaintiffs' 56.1 Statement (emphasis added; bracketed numbers added).)  That is, Plaintiffs have not specifically controverted the Northwell Defendants' Rule 56.1 Statements, which the relevant rule, Local Rule 56.1(c), unambiguously requires.  Further, as the Plaintiffs have put forth bald statements of fact, they have also failed to comply with Local Rule 56.1(d), which dictates that "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, *must* be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." (emphasis added).  The Second Circuit has stated that "where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion."  *Holtz*, 258 F.3d at 74.  (*See also* Reply at 3, note 2 (collecting cases).)

The Northwell Defendants argue that "[h]ere, where the Northwell Defendants' 56.1 Statement is so thoroughly researched and bristles with record citations whereas the skeletal Counterstatement lacks any evidentiary foundation and is really nothing more than assertions, it makes sense to apply the Rule as written in line with the case law cited and to deem the Northwell Defendants' Statement admitted."  (Reply at 3.)  They further contend that "[P]laintiffs' unsupported Counterstatement actually endorses many of the undisputed facts set forth in [their] . . . Rule 56.1 Statement [] and is largely consonant with it."  (*Id.* (*comparing*

Plaintiffs' Rule 56. 1 Statement, ¶¶ 3, 7 & 11,[12] *with* Northwell's Rule 56.1 Statement, ¶¶39, 50 & 70); *see also id*. at 4 (comparative citations omitted).)  Finally, because the "Plaintiffs make no response to" ¶¶1-27, 34-38, 40, 41, 45-47, 49, 51, 52, 54-69, 71-92, 94, 97-109, 112-17, 119, and 120, the Northwell Defendants assert the Plaintiffs have admitted them.  (*Id.* at 4.)  The Court agrees.  Hence, the Northwell Defendants' Rule 56.1 Statements are deemed admitted for purposes of the Summary Judgment Motion.  *See Giannullo*, 322 F.3d at 140 (where opposing party fails to controvert a fact, that fact is deemed admitted); *Taylor & Fulton*, 2011 WL 6329194, at *4 (deeming admitted facts asserted in a movant's Rule 56.1 Statement where nonmovant's Rule 56.1 Statement is deficient); *see also Ezagui*, 726 F. Supp.2d at 285 n.8 (deeming admitted Rule 56.1 Statements not specifically denied with citations to supporting evidence for purposes of deciding summary judgment motion); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp.3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *Emanuel v. Griffin*, No. 13-cv-1806, 2015 WL 1379007, *2 (S.D.N.Y. Mar. 25, 2015).  The Court also notes that in their Rule 56.1 Statement, the Plaintiffs make no mention of the Northwell Trio; nor is there any statement regarding customs or policies of the Northwell Hospital Entities [or that any one of the Northwell Trio was a policymaker].

## 2.  Plaintiffs' Attempt to Present Disputed Facts

As they did in opposition to the County Defendant's Summary Judgment Motion, in their Opposition, the Plaintiffs cite to evidence in the record to dispute the facts put forth by the Northwell Defendants in their Rule 56.1 Statement.  However, the Court is not persuaded.

---

[12]  The Court and the Northwell Defendants assigned paragraph numbers to the unnumbered, "bulleted" paragraphs contained in Plaintiffs' Rule 56.1 Statement "for ease of identification".  (Reply at 3, note 4.)  Those numbers are the same.

Indeed, as the Northwell Defendants astutely state, "much of the scattered 'evidence' that [P]laintiffs do tender in their [O]pposition . . . is inadmissible and should be excluded." (Reply at 4.) In addition to "avoid[ing] hundreds of pages of admissible medical records submitted as part of the record of this motion, making no mention of them in their [Opposition], except for a single progress note[,] Plaintiffs also eschew deposition transcripts," failing to "cite the depositions of *any* of the key parties." (*Id.* at 5 (emphasis in original).) Rather, the Northwell Defendants argue, the Plaintiffs rely on declarations which "are all inadmissible in whole or in part." (*Id.* at 5-6.) More particularly, the Northwell Defendants assert that the declarations of Attorneys Theresa Mari ("Mari") (Father's counsel in Protective Proceedings) and Robert Venturo ("Venturo") (Mother's counsel in Protective Proceedings) should be excluded pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure because "neither Ms. Mari nor Mr. Venturo was ever disclosed by [P]laintiffs as a potential witness pursuant to Fed. R. Civ. P. 26(c)" and the Plaintiffs cannot show that their failure to disclose Mari and Venturo previously was justified or harmless. (*See* Reply at 11 (citing Ex. MM (Pls.' Rule 26(a)(1) Prelim. Discl.), attached to Rosof Reply Decl.)); *see also id.* at 12 (arguing that Venturo's declaration is essentially an expert opinion concerning Family Court practice and procedure, but since Venturo was never identified as an expert witness, his declaration should be excluded) and note 7 (collecting cases).) The Court agrees.[13] The Northwell Defendants also posit that, while

---

[13] By way of further example, the Court notes that the declaration of Dr. Robert Peyster, M.D., the Plaintiffs' medical expert, does not comply with 28 U.S.C. § 1746, as it was not made under penalty of perjury. (*See* Ex. 6, attached to Del Col. Decl.) *See generally, e.g., Yearwood v. LoPiccolo*, No. 95-cv-2544, 1998 WL 474073, at *5 (S.D.N.Y. Aug. 10, 1998)(declining to consider unsworn declaration that did not comply with 28 U.S.C. § 1746 when ruling on a summary judgment motion). Moreover, notwithstanding stating his declarations were made "after being duly sworn," there is no notary jurat indicating that Dr. Peyster swore to or affirmed the truthfulness of his declarations. Therefore, the Court need not consider it. *See generally, e.g., White v. Sears, Roebuck & Co.*, No. 07-cv-4286, 2009 WL 1140434, *3 (E.D.N.Y. Apr. 27,

Attorney McCarthy ("McCarthy") (counsel for Lana and the Brothers in Protective Proceedings) was identified as a potential witness, "her Declaration is still objectionable because it is not limited to matters within her personal knowledge as a fact witness (*see* Fed. R. Civ. P. 56(c)(4)), and is riddled with inadmissible hearsay about what various other people allegedly told her (*e.g.*, McCarthy Decl. ¶¶3-5, 7-9, 10, 12-13)." (*Id.* at 12.) This Court has already reached the same conclusion. (*See* County Summary Judgment Order at 35, note10, and 36 (declining to consider, *inter alia*, McCarthy Aff.).)

Furthermore, as stated in the County Summary Judgment Order, "to the extent Plaintiffs cite to an entire exhibit, without greater specificity, the Court need not consider it." (County Summary Judgment Order at 26; *see also id.* at 27 (collecting cases).) And, consistent with deciding the County's Summary Judgment Motion, here, where the Plaintiffs provided pinpoint citations, the Court reviewed the cited evidence, but found it wanting. For example, in support of their contention that

> Plaintiffs can now prove that while swearing to the fact that Lana was violently shaken, evidence, like CT scans, which proved Lana had no traumatic brain injury or subdural hemorrhages in her brain were withheld and in its place appear false and patently untrue allegations of "*widespread bleeding in her brain and neck*," "*spinal cord injury*," and "*widespread brain damage that is traumatic in nature*," such as "*seen when shaking an infant*."

(Opp'n at 3 (emphasis in original)), Plaintiff cite to, *inter alia*, their Exhibits 4 (at pages 44, 46-48), and 5 (at pages 11-23). However, neither exhibit demonstrates that any evidence was withheld or that other, false evidence was substituted. Rather, Exhibit 4 is the Family Court trial transcript of the direct and cross-examination testimony of Dr. Johnson, a neuroradiologist who,

2009)(stating "unsworn documents should be disregarded in evaluating a motion for summary judgment").

36

at the request of Hoffman-Rosenfeld, "reviewed many of the neuroradiology films that [Lana] had" (*id.* at 11:7-8) and testified, *inter alia*, that the images of Lana's brain showed an increase of swelling over time (*id.* at 47:8-10) and a "very severe injury" (*id.* at 47:20-22). Exhibit 5 is the transcript of the deposition testimony of Dr. Mir regarding his interpretation of Lana's January 3, 2014 head CT, during which he testified, *inter alia*, that while there was no evidence of widespread subdural hemorrhaging in that scan, there was evidence of brain damage, but that he could not state with certainty the specific cause of the injury, *i.e.*, whether or not the injury was traumatic in nature. (*Id.* at 13:1-4, 16-2014:19-15:15.) Further to the extent that Plaintiffs rely on these exhibits to demonstrate there was no traumatic brain injury (*see* Opp'n at 6 (citing Ex. 4 at 25, 46-48; Ex. 5 at 9-21)), that is unavailing. Dr. Johnson did not testify about trauma and Dr. Mir testified that he could not specifically determine, one way or the other, whether trauma was the cause of Lana's brain injury. Hence, at best, Plaintiffs mischaracterize Dr. Mir's testimony that he was "unequivocal" that there was "no evidence of trauma". (Opp'n at 7 (without citation to the record).

Plaintiffs also attempt to interject evidence into the record through their Opposition in their reliance on Exhibits 13 and 14 in support of their sweeping contention:

> Together, Hoffman-Rosenfeld, Mittler, and Gilleran not only took witness statements, reported to and advised CPS workers and senior official, but were essential in the decision-making process of whether or not to initially prosecute and, later on after the autopsy was released, continue to prosecute.

(Opp'n at 10 (citing Ex. 13 at 37-38; and Ex. 14 at 19-20, 35, 41, 45).) Exhibit 13 is the transcript from the deposition of Attorney Steven Nacht, who represented CPS in the Family Court trial of the Parents. The essence of Attorney Natcht's cited testimony is that Hoffman-Rosenfeld advised him that the Medical Examiner's autopsy did not rule out trauma as causing

Lana's brain injuries; thus, at most, there is implicit support for the notion that Hoffman-Rosenfeld "reported" certain information to a CPS representative. However, the balance of the Plaintiffs' statement finds no support in cited material. The other cited exhibit, Exhibit 14, is the transcript from Attorney Jeffrey Tavel's deposition, who testified that Hoffman-Rosenfeld's "opinion was instrumental in whether or not th[e] prosecution went forward" (*id.* at 19:6-12); however, Tavel also identified numerous people who met to discuss Lana's case (*see id.* at 19:21-20:12[14]). He further acknowledged that Hoffman-Rosenfeld was "intimately involved in presenting [CPS's] case" (*id.* at 35:22-25), in that she was advising Tavel on medical issues (*see id.* at 36:2-3; *see also id.* at 36:5-8 ("Q: [Hoffman-Rosenfeld] is the single contact that you are having on a routine basis about medical evidence being presented in the case? A: That's fair.").) Importantly, when asked if it was Hoffman-Rosenfeld and CPS that decided whether or not to initiate the Protective Proceedings, Tavel testified:

> A:  It would only be CPS making that decision.
> Q:  It is ultimately CPS's decision based on what they are
>      hearing from Dr. Hoffman-Rosenfeld *and their other*
>      *investigation or research*?
> A:  Yes.

(*Id.* at 41:2-12 (emphasis added).) At best Tavel's cited testimony indicated that Hoffman-Rosenfeld "advised" CPS's attorney, and not the asserted "CPS workers and senior officials", about medical issues in the Protective Proceeding.

In sum and even assuming, *arguendo*, that the Northwell Defendants' Rule 56.1 Statements were not deemed admitted, Plaintiffs have not pointed to any admissible evidence that the Northwell Defendants, acting under color of state law, intentionally deceived and

---

[14]  Attorney Tavel identified: his supervisor, Michael Heiser; CPS worker Pidel; CPS supervisor Peterson; the Northwell Trio; Dr. Johnston, a radiologist; "a couple of nurses"; and "one or two others".

mislead the CPS workers or otherwise conspired with CPS and its employees, in maliciously commencing and continuing the Protective Proceedings and thereby causing the alleged egregious violations of the Plaintiffs' constitutional rights.

### 3. The Northwell Defendants Did Not Act Under Color of State Law

"State action 'occurs were the challenged action of a private party is fairly attributable to the state.'" *Hollander v. Copacaban*, 624 F.3d 30, 33 (2d Cir. 2010) (quoting *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995); further citation and internal quotation marks omitted).

### (a.) *Plaintiffs Fail to Satisfy the Joint Action Test*

Plaintiffs argue that the Northwell Trio did much more than simply 'make a report'" (Opp'n at 21), *i.e.*, they "conspired with each other to advance a false narrative and took advantage of the plainly incompetent CPS workers . . . ." (id. at 22-23) to cause the Protective Proceedings to be brought against the Parents (*see id.* at 22). Without benefit of citation, the Plaintiffs contend: "It is an inescapable conclusion that [the Northwell Trio] is best described as part of the investigative team and an integral part of the prosecutorial apparatus acting more like detectives than doctors." (*Id.* at 25.) However, there is no admissible evidence in the recording supporting this position, which the Court liberally construes as Plaintiffs' attempt to satisfy the Joint Action Test by claiming a conspiracy between the Northwell Defendants and CPS. (*See id.* at 26.) *See also Caballero*, 2019 WL 2491717, at *3 ("The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state agents].")(quoting *Frobes*, 2008 WL 3539936, at *5). In the absence of such evidence, Plaintiffs cannot show the Northwell Defendants acted in concert with CPS to commit any unconstitutional

act.  *See id.* at *3, note 6 (noting the Joint Action Test and a § 1983 conspiracy claim are subject to the same standard (citing *Ciambriello*, 292 F.3d at 323-24; further citation omitted)).

The Court's conclusion that Plaintiffs cannot satisfy the Joint Action Test in buttressed by *Estiverne*, where the district court found insufficient evidence of the defendants acting under color of state law.  910 F. Supp.2d at 442.  There, a nine-month-old child presented with an unusual fracture for his age; however; "the fact that Adult Plaintiffs had no explanation for the fracture," and the child was unable to explain his injury, the defendant doctor directed the hospital social worker to file a report of suspected child abuse.  *Id.* at 437, 440.  That report prompted an investigation by the ACS,[15] which assigned an ACS caseworker to further investigate the suspected abuse.  *See id.* at 440.  Part of the ACS caseworker's investigation was speaking with the doctor; the doctor also spoke with ACS's attorney.  *See id.* at 440, 441.  The doctor "did not express an opinion as to whether the [child] was being abused, nor did she express any opinion as to whether ACS should file a petition to have [the child] or his siblings removed from Adult Plaintiff's household."  *Id.*; *see also id.* at note 12 (finding, despite Plaintiff's assertion that doctor "withheld exculpatory evidence from ACS," that there was no evidence to support same).  Since the only role the doctor and hospital, both private actors, played in ACS's investigation, and subsequent filing of a removal petition, was providing medical opinions, there was no showing that those defendants willfully participated in joint activity with ACS, *i.e.*, they did not act under color of state law; therefore, there was no basis to impose § 1983 liability on them.  *See id.* at 441, 442.  The same holds true here.  Lana suffered a traumatic injury which, because she was an infant, she could not explain and for which the Parents did not provide a satisfactory explanation (*see* NW 56.1 Statement, ¶¶65, 86, 89).  After

---

[15] (*See, e.g.*, County Summary Judgment Order at 43, note 18.)

consultation among doctors (*see id.* at p¶68-69), a social worker made a mandated report of suspected child abuse based upon Lana's condition (*see id.* at ¶70), which prompted an investigation by CPS (*see id.* at ¶¶72-73, 79, 80). Hoffman-Rosenfeld and Mittler provided medical opinions to CPS, but did not conclude that Lana had been abused (*see id.* at ¶¶89-93.) It was CPS's decision to commence the Protective Proceedings, and not that of Hoffman-Rosenfeld. (*See id.* at ¶93-94.) Additional input and updates from the Northwell Defendants as CPS's source for medical information regarding Lana's case, which presented a dynamic situation, does not morph the Northwell Defendants from private actors into persons or entities acting under color of state law since "[m]ere cooperation with a state official or investigatory agency is insufficient to establish state action." *Id.* at 442 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)(further citation omitted). Thus, upon the record presented, Plaintiffs have failed to satisfy the Joint Action Test in establishing the requisite state action.

(b.) *Plaintiffs Fail to Satisfy the Public Function Test*

The Northwell Defendants argue that the Plaintiffs have failed "to proffer [admissible] evidence . . . that the County Defendants did not make the decision to file for removal, did not conduct their own investigation[,] and that the private Northwell Defendants, separate and apart from providing a medical opinion as mandated reporters, in essence usurped the State's decision." (Reply at 15.) The Court agrees. As an initial matter, "care of patients by doctors is not a function that is 'exclusively reserved by the state.'" *Herring*, 2018 WL 7150387, at *5 (quoting *Sybalski*, 546 F.3d at 260); *cf., e.g., Caballero*, 2019 WL 2491717, at *4 (finding that hospital which provided prisoner with medical care, even after admitting prisoner to the hospital, was not enough to find hospital a state action under the Public Function Test). Neither can the reporting of suspected child abuse and neglect by mandatory reporters, such as the Northwell

Defendants, nor cooperating with the subsequent investigation into that report, be deemed a tradition, exclusive function of the State, since, by its very nature, the State's mandatory reporting statute contemplates assistance from certain non-state actors. *See* N.Y. Soc. Serv. Law § 413(1)(a) (listing as mandatory reporters, *inter alia*, "any physician; registered physician assistant; surgeon; medical examiner; coroner; . . . optometrist; . . . resident; intern; . . . registered nurse; social worker; emergency medical technician; . . . hospital personnel engaged in the admission, examination, care or treatment of persons; . . ."); *see also Estiverne*, 910 F. Supp.2d at 440, n.10 (noting certain professionals, including physicians, are required to report suspected abuse). Hence, to hold the Northwell Defendants liable under § 1983 for fulfilling their mandatory statutory duty, in the absence of any evidence of bad faith, *see, e.g., J.C. v. Mark Country Day School*, No. 03-cv-1414, 2007 WL 201163, at *6-7 (E.D.N.Y. Jan. 23, 2007)(stating that, in the absence of evidence of bad faith, mandator reporter's reporting suspected abuse benefits from presumption of good faith), would be, at best, illogical. Moreover, "[w]hen a private hospital admits and performs tests on a child for medical reasons, the hospital is not subject to liability under § 1983, even if concerns of abuse partially inform the decision." *Estiverne*, 910 F. Supp.2d at 442 (citing *Kia P. v. McIntyre*, 235 F.3d 749, 756-57 (2d Cir. 2000)). Here, despite the Plaintiffs' proclamations to the contrary (*see* Opp'n at 27 (baldly stating, "In the action being scrutinized here, it has been proved that [the Northwell Trio] acted as '*investigators*' and, as part of the '*investigation*' apparatus, performed many functions that would ordinarily be undertaken by the State, and it was Northwell's conclusion regarding "shaken baby' that cornered the petitions.")(emphasis in original)), there is no admissible evidence supporting their contention that CPS relinquished to the Northwell Trio, or any of the other Northwell Defendants, its traditional, exclusive role of investigating the report of the

suspected abuse of Lana and deciding, thereafter, whether to initial removal proceedings in Family Court against the Parents. To the extent Plaintiffs rely on the allegations in their Amended Complaint to satisfy the Joint Action Test (*see id.* ("It is also alleged that Hoffman-Rosenfeld was instrumental in the investigation and literally controlled the flow of medical misinformation which lead to the wrongful deprivation of liberty;" and "[G]iven the allegations regarding the united, indeed inseparable actions of the Northwell defendants and CPS, both properly qualify as State actors whose gross misconduct led to constitutional harm . . . .")), that is patently insufficient at the summary judgment stage. *See, e.g., McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)("[W]ith a motion for summary judgment adequately supported by affidavits, the party opposing the motion cannot rely on allegations in the complaint, but must counter the movant's affidavits with *specific* facts showing the existence of genuine issues warranting a trial." (citing Fed. R. civ. P. 56(c) (emphasis added)); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)(instructing that to defeat summary judgment, the non-movant must "go beyond the paper allegations of the pleading" and set forth specific facts showing that there is a genuine issue for trial); *Patacca v. CSC Hldgs, LLC*, No. 16-cv-679, 2019 WL 1676001, *17 (E.D.N.Y. Apr. 17, 2019) (same). Instead, as the Northwell Defendants state: "[P]laintiffs have tendered nothing but speculation that CPS abdicated all responsibility for its own decision-making as part of a grand conspiracy to cover up alleged medical malpractice . . . and alleged CPS incompetence" (Reply at 16), which falls short of establishing state action under the Public Function Test.

(c.) *Plaintiffs Fail to Satisfy the State Compulsion Test*

"A finding of state action through state compulsion 'requires actual coercion by a state actor that impacts upon the private physician's decision-making.'" *Herring*, 2018 WL 7150387,

at *5 (quoting *Doe v. Harrison*, 254 F. Supp.2d 338, 342 (S.D.N.Y. 2003); further citation omitted). Since the theory of Plaintiffs' case is, essentially, that the Northwell Defendants, especially Hoffman-Rosenfeld, usurped CPS's investigation of suspected abuse of Lana and CPS's decision to initiate the Protective Proceedings against the Parents, it is not surprising that the Plaintiffs have not put forth any argument of state action pursuant to the State Compulsion Test. (*See also* County Summary Judgment Order, Part III(B)(4) (discussing waiver of claim when plaintiff fails to argue in support of such claim, and collecting cases).) Nor is there any admissible evidence which would support such a conclusion.

\* \* \*

In sum, having failed to establish under the Joint Action, Public Function, or State Compulsion Test that any of the Northwell Defendants' actions were fairly attributable to the County Defendants, *i.e.*, the State, the Plaintiffs are unable to meet the requisite showing that the Northwell Defendants acted under color of state law. *See K&A Radiologoy*, 189 F.3d at 280 (holding that plaintiff seeking to hold a private individual or entity liable pursuant to § 1983 must first demonstrate such person or entity acted under color of state law). In turn, that precludes the Plaintiffs from bringing § 1983 claims against the Northwell Defendants since claimed deprivations of Constitutional rights must be shown to have been perpetrated by persons or entities acting under color of state law. *See, e.g., West v. Atkins*, 487 U.S. 42, 48 108 S. Ct. 2250 (1988)("To state a claim under 1983, a plaintiff must alleged the violation of a right secured by the Constitution and laws of the United States, *and must show that the alleged deprivation was committed by a person acting under color of state law*." (emphasis added). Because the Court finds no state action on the part of the Northwell Defendants, it need not decide whether the Northwell Defendants violated Plaintiffs' constitutional rights. *Cf., e.g., J.C. v. Mark County*

*Day School*, No. 03-cv-1414, 2007 WL 201163, at 4 (E.D.N.Y. Jan. 23, 2007) (finding it

unnecessary to address plaintiff's constitutional claims where defendants were found not to be

state actors within the meaning of § 1983).

                4.   Immunity to the Plaintiffs' § 1983 Claims

Even if the Court were to find the Northwell Defendants were state actors, qualified

immunity would shield them from § 1983 liability.  As the Northwell Defendants aptly assert,

qualified immunity:

> is based on "the need to avoid the impossible burden that would
> fall upon all our agencies of government if those acting on behalf
> of the government were unduly hampered and intimidated in the
> discharge of their duties by a fear of personal liability[,]" *Filarsky*
> [*v. Delia*], [566 U.S. 377,] 132 S. Ct. [1657,] 1662 [(2012)]
> (internal quotation marks omitted), and ensures "that those who
> serve the government do so with the decisiveness and the judgment
> required by the public good[,]" *id.* at 1662 (internal quotation
> marks omitted).  Toward that end, it affords officials "breathing
> room to make reasonable but mistaken judgments" without fear of
> disabling liability. *Zalaski v. City of Hartford*, 723 F.3d 382, 389
> (2d Cir. 2013).  Qualified immunity employs a deliberately
> "forgiving" standard of review that "provides ample protection to
> all but the plainly incompetent or those who knowingly violate the
> law." *Id.* (citations omitted).  This is particularly true in child
> abuse and neglect proceedings, where the standard is applied
> deferentially. *See Shapiro*, 2004 WL 2698889, at *19-20.

(Support Memo at 7-8.)

The alleged incompetence complained of by Plaintiffs is that of the CPS employees.  (*See*

Opp'n at 21.)  As to the Northwell Trio, particularly Hoffman-Rosenfeld, the Plaintiffs would

fault them for conveying information to CPS, asserting that it was the Trio who had absolute

control over the information used by CPS in its investigation and Petitions.  (*See id.* at 22

("Defendant Hoffman-Rosenfeld's stubborn insistence, coupled with the sway she had over CPS,

the County attorney and the Attorney For the Children . . . . , is, in large part, responsible for the

emotional and constitutional harm inflicted on the Keenans. (Exs. '15' and '16')[.]".) It appears that Plaintiffs take the position that the Northwell Defendants' conveyance of information regarding Lana to CPS was, in some manner, "*shocking, arbitrary and egregious*," thereby stripping them of qualified immunity. (*See id.* at 23 ("Plaintiffs understand that while CPS caseworkers are afforded '*unusual deference*' in removal proceedings, [this] standard of review does not permit '*shocking, arbitrary, and egregious*' acts such as those appearing in the Complaint and proven during discovery." (emphases in original)); *see also id.* at 24 (baldly contending that the Northwell Trio "acted as undercover investigators, made critical determinations that propelled the case forward, interviewed witnesses, gave reports, filtered medical information, and advised caseworkers and counsel while convincing everyone at CPS to go forward and seek Orders of Protection and removal").) However, the unrebutted evidence demonstrates otherwise. (*See* NW 56.1 Statement, ¶¶93-94.)

Further, given the Second Circuit's deferential standard in the context of child abuse or neglect proceedings, "emphasizing that 'courts must apply the 'reasonable basis' test to permit investigators considerable discretion in the abuse context," *Shapiro*, 2004 WL 2698889, at *19 (quoting *Wilkinson*, 182 F.3d at 106), together with the dearth of evidence that any of the Northwell Defendants were plainly incompetent or knowingly violate the law, there would be no basis to deny the Northwell Defendants qualified immunity in this instance. Indeed, the Northwell Defendants would have knowingly violated the law if they had not made their report of suspected abuse. S*ee* N.Y. Soc. Serv. L. § 411, *et seq.* ("CPSA"); *see also J.C. v. Mark County Day School*, No. 03-cv-1414, 2007 WL 201163, at *6 ("Mandated reporters need not await conclusive evidence of abuse or maltreatment but must act on their reasonable suspicions and the law allows them a degree of latitude to err on the side of protecting children who may be

suffering from abuse." (quoting *Isabelle V. by Neyes F. v. City of N.Y.*, 150 A.D.2d 312, 312, 541 N.Y.S.2d 809, 810 (1st Dep't 1989)); *Storck v. Suffolk County, Dep't of Soc. Servs.*, 62 F. Supp.2d 927, 945 (E.D.N.Y. 1999) ("The CPSA makes the failure to report a reasonable suspicion of abuse a criminal offense." (citing N.Y. Soc. Serv. L. §420)). On the record presented, and assuming, *arguendo*, that they were found to be state actors, there are no material disputed facts that would strip the shield of qualified immunity from the Northwell Defendants in defense of Plaintiffs § 1983 claims against them.

### 5. Plaintiffs' Pendant State Law Claims

Regarding their pendant state law causes of action against the Northwell Defendants, having determined that the Northwell Defendants are entitled to summary judgment on all of Plaintiffs' § 1983 claims, the Court declines to exercise supplemental jurisdiction over their remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) ("It is well to recall that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306, (2d Cir)(2003)(quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1998)); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)(same).

The Court has considered the Plaintiffs' remaining arguments in opposition to the

Summary Judgment Motion and finds them to be without merit.[16]

---

[16] Plaintiffs' letter motion seeking to strike the Northwell Defendants' Reply or, alternatively, be allowed to file a sur-reply (hereafter, the "Strike Motion") (*see* ECF No. 174), is denied.

> "Rule 12(f) [of the Federal Rules of Civil Procedure] allows a court to strike pleadings only." *McKinney v. Dzurenda*, No. 3:10CV880 AVC, 2013 WL 1296468, at *1 (D. Conn. Mar. 27, 2013). Objections to motions are not pleadings. *See* Fed. R. Civ. P. 7(a) (pleadings only include complaint; third-party complaint; answer to complaint, counterclaim, crossclaim, or third-party complaint; and a reply to an answer, if ordered by the court). It is therefore inappropriate to strike [Defendant's] Objection. *See Santiago v. Owens-Illinois, Inc.*, No. CIV 3:05CV00405 JBA, 2006 WL 3098759, at *1 (D. Conn. Oct. 31, 2006)(denying motion to strike opposition memorandum); *McKinney v. Dzurenda*, No. 3:10CV880 AVC, 2013, at *1 (D. Conn. Mar. 27, 2013)(denying motion to strike plaintiff's declaration).

*Britt v. Elm City Cmtys*, No. 3:17-cv-2159, 2018 WL 3574866, at *2 (D. Conn. July 24, 2018)(bracketed matters added). By extension, the same holds true as to reply memoranda. Moreover, there is no basis to grant the Strike Motion as there is no redundant, immaterial impertinent, or scandalous matter in the Northwell Defendants' Reply. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter.").

Regarding Plaintiffs' alternative relief, *i.e.*, permission to file a sur-reply, this Court's Individual Rule 4(G) clearly states that "all motion briefs, including reply briefs are to comply with the Court's Local Rules . . . [,] and *[n]o rebuttal, sur-reply, etc., shall be accepted*." SJF Individual Rule 4(G) (emphasis in original). Since December 19, 2016, the parties have been on notice that their dispositive motions were to be filed in accordance with the undersigned's Individual Rules. (*See* Dec. 19, 2016 Minute Entry (ECF No. 96).) "Motions for leave to file sur-reply information . . . are subject to the sound discretion of the court." *Barbour v. Colvin*, 993 F. Supp.2d 284, 287 (E.D.N.Y. 2014)(citation omitted). Having consider Plaintiffs' arguments in support of their Strike Motion, in conjunction with the fact that the parties were on notice that the Court does not accept sur-replies, the Court finding no basis to waive Individual Rule 4(G) in this instance.

To the extent Plaintiffs are seeking the same relief as to the County Defendants, for the same reasons as stated above, the Strike Motion is denied.

IV.    Conclusion

Accordingly, after drawing all inferences and resolving all ambiguities in favor of the Plaintiffs, and finding that no rational jury could find in Plaintiffs' favor that the Northwell Defendants were acting under color of state law, which finding is required to sustain Plaintiffs' § 1983 causes of action against the Northwell Defendants, IT IS HEREBY ORDERED that the Northwell Defendants' Summary Judgment Motion is GRANTED to the extent that:

A.  Plaintiffs' Counts 1-6 are dismissed with prejudice as to the Northwell Defendants;

B.  Plaintiffs' pendent state-law claims are dismissal without prejudice as to the Northwell Defendants; and

C.  The Clerk of Court is directed to enter judgment in favor of the Northwell Defendants and, thereafter, close this case.

The July 31, 2019 Pretrial Conference is marked off the Court's calendar.


SO ORDERED this 29th day of July 2019 at Central Islip, New York.

/s/ *Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge